# 21-1499

## United States Court of Appeals for the Second Circuit

IN RE: GRUPO TELEVISA SECURITIES LITIGATION,
*Petitioner.*

(*caption continued on inside cover*)

*On Petition for Writ of Mandamus to the United States District Court
for the Southern District of New York, No. 1:18-cv-01979, Hon. Louis L. Stanton*

**Brief of Illinois Public Pension Fund Association; Michigan Association of Public Employee Retirement Systems; City of Dearborn Heights Police and Fire Retirement System; City of Grand Rapids General Employees Retirement System; City of Grand Rapids Police and Fire Retirement System; City of Hialeah Employees Retirement System; City of Miami Firefighters and Police Officers Retirement Trust; City of Roseville Employees Retirement System; City of Roseville Police and Fire Retirement System; City of St. Clair Shores Police and Fire Retirement System; City of Warren General Employees Retirement System; Employees Retirement System of the City of Providence; Government Employees' Retirement System of the Virgin Islands; Monroe County Employees Retirement System; Waterford Township Police and Fire Retirement System; and Wayne County Employees Retirement System as *Amici Curiae* in Support of Petitioner**

Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Rd
Sixth Floor
Ridgefield Park, NJ 07660
Tel.: 973-639-9100
Fax: 973-679-8656
Email: cseeger@seegerweiss.com

Hyland Hunt
Ruthanne M. Deutsch
Alexandra Mansbach
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Attorneys for* Amici Curiae

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

COLLEGES OF APPLIED ARTS AND TECHNOLOGY PENSION PLAN, ROBBINS GELLER RUDMAN & DOWD LLP, PALM TRAN, INC. AMALGAMATED TRANSIT UNION LOCAL 1577 PENSION PLAN, INDIVIDUALLY AND ON BEHALF OF THE CERTIFIED CLASS, *Petitioners,*

v.

SALVI RAFAEL FOLCH VIADERO, EMILIO FERNANDO AZCARRAGA JEAN, GRUPO TELEVISA, S.A.B., MELVIN GROSS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, RANDOLPH E. WISE REVOCABLE LIVING TRUST, ARROWSTREET CAPITAL LP, *Respondents.*

## CORPORATE DISCLOSURE STATEMENT

As called for by Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* state that they have no parent corporations and that no publicly held corporation owns 10% or more of their stock. *Amici* are: City of Dearborn Heights Police and Fire Retirement System; City of Grand Rapids General Employees Retirement System; City of Grand Rapids Police and Fire Retirement System; City of Hialeah Employees Retirement System; City of Miami Firefighters and Police Officers Retirement Trust; City of Roseville Employees Retirement System; City of Roseville Police and Fire Retirement System; City of St. Clair Shores Police and Fire Retirement System; City of Warren General Employees Retirement System; Employees Retirement System of the City of Providence; Government Employees' Retirement System of the Virgin Islands; Illinois Public Pension Fund Association; Michigan Association of Public Employee Retirement Systems; Monroe County Employees Retirement System; Waterford Township Police and Fire Retirement System; and Wayne County Employees Retirement System.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ...........................................................................................5

The Unprecedented Disqualification Order Will Have Far-Reaching Effect, Thwarting Congress's Preference for Institutional Investors as Lead Plaintiffs.......5

    A.   Congress Made a Considered Choice Favoring Institutional Investors as Lead Plaintiffs. .....................................................5

    B.   The Disqualification Order Will Effectively Bar Institutional Investors from Serving as Lead Plaintiffs in Many Securities Cases. ......11

CONCLUSION .....................................................................................16

# TABLE OF AUTHORITIES

CASES                                                                 Page(s)

*Gluck v. CellStar Corp.*, 976 F. Supp. 542 (N.D. Tex. 1997) ...................................8

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ............................... 6, 7, 10

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005).......................... 5, 6, 7

*In re Gentiva Sec. Litigation*, 281 F.R.D. 108 (E.D.N.Y. 2012) ............................8

*In re Merck & Co. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005).....................................7

*In re Party City Sec. Litig.*, 189 F.R.D. 91 (D.N.J. 1999) ........................................7

*In re Third Circuit Task Force on the Selection of Class Counsel*, 2002 U.S. App. LEXIS 30242 (3d Cir. Jan. 15, 2002).....................................................................6

*In re Vesta Ins. Grp. Sec. Litig.*, No. 98-AR-1407-S, 1999 U.S. Dist. LEXIS 22233 (N.D. Ala. Oct. 25, 1999) ......................................................................................9

*Juliar v. SunOpta, Inc.*, 2009 U.S. Dist. LEXIS 58118 (S.D.N.Y. Jan. 30, 2009)....8

*Kloster v. McColl (In re BankAmerica Corp. Sec. Litig.)*, 350 F.3d 747 (8th Cir. 2003) ........................................................................................................6

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248 (11th Cir. 2014)....................................................................... 9, 10

*SEC v. Rajaratnam*, 622 F.3d 159 (2d Cir. 2010) ...................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................8

*Xianglin Shi v. SINA Corp.*, 2005 U.S. Dist. LEXIS 13176 (S.D.N.Y. July 1, 2005)........................................................................................7


STATUTES

15 U.S.C.

    § 78m(f) ....................................................................................................13

    § 78u-4(a)(2)(A)(iv) ............................................................................... 2, 11

    § 78u-4(a)(3)(A)(i)(II) ..............................................................................14

    § 78u-4(a)(3)(B)(i)....................................................................................14

    § 78u-4(a)(3)(B)(iii) ...................................................................................6

iii

## CONGRESSIONAL MATERIALS

H.R. Conf. Rep. No. 104-369 (1995)..................................................... 5, 7, 16

S. Rep. No. 104–98 (1995) ...................................................................5, 6

## OTHER AUTHORITIES

Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (2019) ...........................................12

Eva C. Carman, et al., *Cert. Denial In Televisa May Embroil 3rd-Party Asset Managers*, Law360 (June 29, 2020)............................................. 12, 15

*The Largest Retirement Funds*, Pensions & Invs. Mag., Feb. 14, 2019.......... 13, 14

Bill McIntosh, *Pension Fund Investors: How hedge funds are adapting to attract allocations*, Hedge Fund J. (Sept.-Oct. 2012) .....................................13

Xuhui Pan, et al., *Does Institutional Ownership Predict Mutual Fund Performance? An Examination of Undiscovered Holdings within 13(F) Reports*, 25 European Fin. Mgmt. 1249 (2019)................................................13

Paulina Pielichata, *Passive assets at all-time high for world's largest managers*, Pensions & Invs. Mag., Oct. 19, 2020...................................................13

Preqin, *Public Pension Funds Investing in Hedge Funds by Region* (2016) ..........13

Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale. L.J. 2053 (1995)......................................................6

Amy Whyte, *Is Hedge Fund Secrecy a Sign of Skill — Or a Red Flag?*, Institutional Investor (July 20, 2020) .................................................14

iv

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are associations of pension funds and pension plans that collectively manage tens of billions in investments on behalf of current and retired government employees across the country. The Illinois Public Pension Fund Association's members collectively manage investments on behalf of over 600 police and fire pension funds. The Michigan Association of Public Employees Retirement Systems is comprised of over 100 public employee retirement systems and healthcare plans. The Government Employees' Retirement System of the Virgin Islands, a pension plan for officials and employees of the Government of the Virgin Islands, is one of the oldest public pension systems under the American flag.

*Amici* also include the following local government pension plans: City of Dearborn Heights Police and Fire Retirement System; City of Grand Rapids General Employees Retirement System; City of Grand Rapids Police and Fire Retirement System; City of Hialeah Employees Retirement System; City of Miami Firefighters and Police Officers Retirement Trust; City of Roseville Employees Retirement System; City of Roseville Police and Fire Retirement System; City of

---

[1] No counsel for any party authored this brief in whole or in part, no party or counsel for a party contributed money to fund preparing or submitting the brief, and no person or entity other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

St. Clair Shores Police and Fire Retirement System; City of Warren General Employees Retirement System; Employees Retirement System of the City of Providence; Monroe County Employees Retirement System; Waterford Township Police and Fire Retirement System; and Wayne County Employees Retirement System.

*Amici* write because correcting the district court's order is of urgent public importance to institutional investors undertaking the private enforcement of federal securities laws. The order is not only clearly and unmistakably wrong on the law and the facts, it will also have a widespread and damaging effect on such anti-fraud litigation. The Private Securities Litigation Reform Act ("PSLRA") embodies Congress's considered choice to favor institutional investors as leaders of private enforcement of the securities laws. The district court's unprecedented disqualification order threatens institutional investors' ability to continue to serve this lead role in deterring and remedying wrongdoing.

Congress requires potential lead plaintiffs to "set[] forth all of the transactions *of the plaintiff* in the security that is the subject of the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv) (emphasis added). Yet the disqualification order—for the first time in any case, so far as *amici* are aware—would require institutional investors also to ascertain and disclose transactions made by third parties over which they have no control and about which they are often unaware. The upshot of

this novel unmanageable-to-impossible requirement will be to discourage or even prevent institutional investors from serving as lead plaintiffs. This would undermine Congress's judgment that the system functions best when expert institutional investors—*i.e.*, those most likely to invest in third-party pooled investment vehicles—take the lead in securities litigation. This Court's corrective guidance is needed now to avoid sweeping disruption to private enforcement of the securities laws.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's disqualification order affects far more than this case. By calling into question what was, until now, a well-settled understanding that the transactions of a third-party pooled investment vehicle are not "transactions of the plaintiff" required to be disclosed by a putative lead plaintiff, the district court's ruling threatens to disrupt hundreds of securities class actions. Across the country, institutional investors with the largest financial stakes—deemed by Congress to be the best lead plaintiffs—will think twice before stepping up, given the challenges of meeting the district court's atextual disclosure standard. Often, they will decide they cannot, because they have sprawling passive investments and limited knowledge of specific transactions made by third parties in such pooled funds. And the severe penalty visited here—disqualification of counsel of choice years into the case—will give institutional investors serious pause and concern that other courts

will follow the district court's error in the absence of this Court's guidance. Many of them will conclude that they simply cannot serve as lead plaintiffs while the district court's disqualification order remains standing.

But deterring institutional investors from taking a leadership role will work a sea change in securities fraud litigation, foiling Congress's careful design to favor institutional investors as lead plaintiffs and thereby promote the efficiency and effectiveness of private enforcement of the securities laws. Why? The large institutional investors that Congress prefers as lead plaintiffs hold trillions of dollars in third-party pooled investment vehicles like hedge funds and mutual funds. Those funds, in turn, hold virtually every security under the sun, and execute an incalculable number of transactions daily. It would be a crippling burden, and in many cases impossible, for institutional investors to ascertain every third-party investment in the subject security made by one of the funds in which it invested.

Until now, courts have steadfastly resisted efforts to disqualify institutional investors as lead plaintiffs based on attributes that are hallmarks of institutional-investor status, to avoid vitiating Congress's steadfast preference for institutional investor lead plaintiffs. The disqualification order, on the other hand, uniquely burdens institutional investors based on the very financial sophistication that Congress prized. The Court should step in now to correct the district court's clear

4

wrong and avoid both the havoc the order will wreak on securities litigation in the near term and the damage to anti-fraud efforts that it will inflict over time.

## ARGUMENT

**The Unprecedented Disqualification Order Will Have Far-Reaching Effect, Thwarting Congress's Preference for Institutional Investors as Lead Plaintiffs.**

### A. Congress Made a Considered Choice Favoring Institutional Investors as Lead Plaintiffs.

When it enacted the PSLRA, Congress intended for more institutional investors to serve as lead plaintiffs in securities class actions. "The Committee intends to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring the court to presume that the member of the purported class with the largest financial stake in the relief is the 'most adequate plaintiff.'" S. Rep. No. 104–98, at 11 (1995); *accord* H.R. Conf. Rep. No. 104-369, at 34 (1995) ("[T]he lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits.").

Before the PSLRA, securities suits were sometimes initiated in the name of "figurehead" plaintiffs with little financial stake in the litigation, *In re Cendant Corp. Sec. Litig. (Cendant II)*, 404 F.3d 173, 191-92 (3d Cir. 2005), often facilitated by "professional plaintiffs," owners of nominal amounts of stock in many major corporations, S. Rep. No. 104–98, at 4, 6; H.R. Conf. Rep. No. 104-369, at 35. Because they had little or no stake in the litigation, "[s]uch figurehead

5

plaintiffs [were] unlikely to monitor attorneys to ensure faithful service to the class." *Cendant II*, 404 F.3d at 191-92; *see also Kloster v. McColl (In re BankAmerica Corp. Sec. Litig.)*, 350 F.3d 747, 751 (8th Cir. 2003); *In re Third Circuit Task Force on the Selection of Class Counsel*, 2002 U.S. App. LEXIS 30242, at *109 (3d Cir. Jan. 15, 2002).

An influential article suggested this problem could be solved if institutional investors served as lead plaintiffs. Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale. L.J. 2053 (1995). This article "provided the conceptual basis for the PSLRA." *In re Third Circuit Task Force*, 2002 U.S. App. LEXIS 30242, at *111 n.225; *see also* S. Rep. No. 104-98, at 11 n.32 (The Weiss & Beckerman article "provided the basis for the 'most adequate plaintiff' provision."); *In re Cendant Corp. Litig. (Cendant I)*, 264 F.3d 201, 262 (3d Cir. 2001) (PSLRA lead plaintiff provisions are "unquestionably based on Weiss and Beckerman's proposal."). To favor institutional investors, Congress dictated that the plaintiff with "the largest financial interest in the relief sought by the class" must be presumed to be the "most adequate plaintiff" to represent the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii). Congress chose this language because it determined that promoting institutional investors as lead plaintiffs best served the interests of shareholders and courts for two main reasons.

First, institutional investors have the largest financial stakes in the litigation. The House Report for the PSLRA explains that "[i]nstitutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market." H.R. Conf. Rep. No. 104-369, at 34. Plaintiffs with the "largest financial interests … will best represent the plaintiff class's interests and will choose the best counsel." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 266 (3d Cir. 2005) (citing Weiss & Beckerman, 104 Yale. L.J. at 2105). Because institutional investors "might have multimillion-dollar interests in securities class actions," they "would have every incentive to make sure that class counsel are doing a good job prosecuting their claims." *Cendant II*, 404 F.3d at 191-92.

Second, institutional investors have the financial sophistication and expertise in the securities market to more effectively "select[], retain[], and monitor[]" class counsel. *Cendant I*, 264 F.3d at 276; *see also, e.g.*, *In re Party City Sec. Litig.*, 189 F.R.D. 91, 104 (D.N.J. 1999) ("PSLRA ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation."). "Each institution is a sophisticated investor with millions of dollars of assets under its control," *Xianglin Shi v. SINA Corp.*, 2005 U.S. Dist. LEXIS 13176, at *16 (S.D.N.Y. July 1, 2005), which makes institutional investors "the most capable representatives of the plaintiff class" to "exercise supervision and control of the lawyers for the class." H.R. Conf. Rep.

7

No. 104-369, at 32 (1995).

Following Congress's explicit instructions, court after court has recognized that institutional investors are the ideal lead plaintiffs. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-21 (2007) ("[Congress] aimed to increase the likelihood that institutional investors—parties more likely to balance the interests of the class with the long-term interests of the company—would serve as lead plaintiffs."); *In re Gentiva Sec. Litigation*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012) ("[M]any courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs in securities exchange class actions."); *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 548 (N.D. Tex. 1997) ("[T]hrough the PSLRA, Congress has unequivocally expressed its preference for securities fraud litigation to be directed by large institutional investors."). This presumption has such force that courts sometimes choose institutional investors as lead plaintiffs even when they do not have the largest financial stake. *E.g.*, *Juliar v. SunOpta, Inc.*, 2009 U.S. Dist. LEXIS 58118, at *8-9 (S.D.N.Y. Jan. 30, 2009).

Because sophisticated institutional investors commonly make investments in third-party pooled investment vehicles, the district court's disqualification order upends Congress's considered determination to have such investors serve as lead plaintiffs. The extra-statutory disclosure requirement is unworkable—and likely to prevent many otherwise-qualified institutional investors from serving—precisely

because of the institutional and financial competence on which Congress sought to capitalize. Until now, courts have rightly and repeatedly refused to disqualify institutional investors based on a "generic argument that would systematically disqualify large investors and institutions from serving as lead plaintiff." *In re Vesta Ins. Grp. Sec. Litig.*, No. 98-AR-1407-S, 1999 U.S. Dist. LEXIS 22233, at *28-29 (N.D. Ala. Oct. 25, 1999) (*citing The SEC Speaks in 1999: Office of The General Counsel Recent Judicial Developments*, 1104 PLI/Corp 291, 484-85 (1999) (internal citations omitted)).

In *Vesta*, the defendants argued that the institutional investor was inadequate to serve as lead plaintiff because it was invested broadly, including in one of the defendants to the action. The court rejected this argument because it recognized that "Congress understood that large institutional investors with multi-billion dollar portfolios would likely always hold equity investments in a broad spectrum of companies." *Id.* As the court explained, "[i]f this condition were enough to defeat certification as a class representative, large institutional investors would almost invariably be disqualified; precisely the opposite of what Congress intended in passing PSLRA." *Id.*

The Eleventh Circuit rejected a similar attempt to disqualify an institutional investor as a lead plaintiff based on a characteristic inherent to such investors. In *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,

9

762 F.3d 1248 (11th Cir. 2014), defendants argued that institutional investors were atypical because they "ceded investment authority to outside managers." *Id.* at 1259. The court rejected this argument, explaining that of course "a large institutional investor is likely to rely on investment advisers to make investment decisions on its behalf," but Congress nonetheless "recognized that these sorts of investors are generally preferred as class representatives in securities litigation." *Id.* at 1260.

Finally, in *Cendant I*, plaintiff argued that CalPERS could not serve as lead plaintiff because it continued to hold stock in the defendant during settlement negotiations, creating a conflict of interest. 264 F.3d at 243-44. But the court concluded that Congress had rejected this argument by creating a presumption that institutional investors would be lead plaintiffs. The court explained that "Congress was aware that an institutional investor with enormous stakes in a company is highly unlikely to divest all of its holdings in that company, even after a securities class action is filed in which it is a class member. By establishing a preference in favor of having such investors serve as lead plaintiffs, Congress must have thought that the situation present here does not inherently create an unacceptable conflict of interest." *Id.*

Just as in *Vesta, Local 703*, and *Cendant I*, it would frustrate Congress's carefully-crafted securities enforcement scheme to impose a countertextual

10

disclosure requirement that would systematically discourage, and sometimes disqualify, institutional investors as lead plaintiffs based on a practice that is not only pervasive, but emblematic of the financial savvy on which Congress intended to rely. Indeed, as explained below, the PSLRA calls for a lead-plaintiff movant to disclose only "the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv). *Amici* are not aware of any other lead-plaintiff disclosure provision, nor did the district court identify one.

### B. The Disqualification Order Will Effectively Bar Institutional Investors from Serving as Lead Plaintiffs in Many Securities Cases.

Congress believed institutional investors would be most effective at deterring securities fraud and assuring recoveries for defrauded investors precisely because of their expertise and financial sophistication. A hallmark of that sophistication is a diverse portfolio that includes many different third-party pooled investment vehicles. By engrafting a novel requirement to disclose the transactions of third-party pooled investment vehicles that is not contemplated in the disclosure requirement set by Congress—to "set[] forth all of the transactions *of the plaintiff* in the security," 15 U.S.C. § 78u-4(a)(2)(A)(iv) (emphasis added)—the district court's order made the very financial expertise that Congress promoted all but disqualifying. It will be near impossible for most institutional investors to identify and disclose such third-party transactions—over which they have no control and

11

about which they often lack knowledge—in the short timeframes required by the PSLRA. The result will be to deter institutional investors from undertaking their congressionally-envisioned lead plaintiff role. Mandamus is warranted to avoid this far-reaching negative effect of the district court's "novel and significant" order on the "administration of justice." *See SEC v. Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010).

**1.** To call the district court's order is novel is quite an understatement. On average, more than 100 securities class actions have been filed in federal court each year since the passage of the PSLRA. *See* Stefan Boettrich & Svetlana Starykh*, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* 2 (2019), https://tinyurl.com/f62257w5. Over 25 years, that adds up to several thousand cases. *Amici* are unaware of a single case, before this one, where a court required disclosure of the transactions of a third-party pooled investment vehicle in which the lead plaintiff was invested. *See* Eva C. Carman, et al., *Cert. Denial In Televisa May Embroil 3rd-Party Asset Managers*, Law360 (June 29, 2020), https://tinyurl.com/64ptdutf (noting that order "appears to break new ground").

**2.** The novel disclosure requirement invented by the district court will have the practical effect of barring many institutional investors from serving as lead plaintiffs. Institutional investors commonly invest trillions of dollars in third-party

pooled investment vehicles, which come in many forms, including mutual funds and hedge funds. In 2011, the top 25 hedge funds received pension fund investments of about $164 billion, and that amount has only increased over time. *See* Bill McIntosh, *Pension Fund Investors: How hedge funds are adapting to attract allocations*, Hedge Fund J. (Sept.-Oct. 2012), https://tinyurl.com/bdf45w; Preqin, *Public Pension Funds Investing in Hedge Funds by Region* (2016), https://tinyurl.com/2k327nbz (pension plan allocation to hedge funds increased from 2010-2016). Over a quarter of the largest defined-benefit pension plans invested in hedge funds in 2018. *See The Largest Retirement Funds*, Pensions & Invs. Mag., Feb. 14, 2019, at 13, 27.

As for mutual funds, a study of filings from 2002 to 2012 under section 13(f) of the Exchange Act, 15 U.S.C. § 78m(f), concluded that 60% of institutional investors invested in mutual funds, and 45% invested in mutual funds that were not actively managed. Xuhui Pan, et al., *Does Institutional Ownership Predict Mutual Fund Performance? An Examination of Undiscovered Holdings within 13(F) Reports*, 25 European Fin. Mgmt. 1249, 1250 (2019) (reporting 15% invested in actively-managed funds). Passive investments, including third-party pooled investment vehicles following passive investment strategies, make up an ever-increasing share of institutional investors' portfolios. *See* Paulina Pielichata, *Passive assets at all-time high for world's largest managers*, Pensions & Invs.

Mag., Oct. 19, 2020, at 3. In 2018, the top 200 defined-benefit pension plans invested over $942 billion in passive indexed equity strategies that were not internally managed. *See The Largest Retirement Funds*, *supra*, at 13.

Institutional investors have no control over their third-party pooled investments, and often are not informed of the third party's specific transactions or holdings. *See* Amy Whyte*, Is Hedge Fund Secrecy a Sign of Skill — Or a Red Flag?*, Institutional Investor (July 20, 2020), https://tinyurl.com/kct9yr2h (discussing funds that are "secretive from their own investors").

Given these constraints, it will be unmanageable, if not impossible, for many institutional investors to clear the new non-statutory disclosure hurdle erected by the district court. The timeline for making lead plaintiff disclosures is very short. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) (60 days for class members to "move the court to serve as lead plaintiff of the purported class"); *id.* § 78u-4(a)(3)(B)(i) (30 days for court to "consider" motion). What's worse, because the district court's disclosure regime is wholly untethered from the statutory text, it also has no literal or logical limit. To take just one example, many hedge funds invest in other hedge funds. *See The Largest Retirement Funds*, *supra*, at 27 (noting that over 25 of the largest defined-benefit pension plans invested in "funds of funds" in 2018). Must an institutional investor search out and disclose not only the transactions of the third-party pooled investment vehicle in which it invested, but also those of the

14

third-party funds in which *that* vehicle invested, like a never-ending series of Russian nesting dolls? The district court's order certainly gives no assurance that it need not do so—on pain of abrupt disqualification of its counsel of choice years into the litigation.

The very institutional investors that Congress wanted to take the lead on securities-fraud enforcement are the most likely to invest in several complex third-party pooled investment vehicles, and thus be unable to research and disclose those third-party transactions in the brief time permitted. At best, many of those with the largest financial stake in the litigation will be discouraged from taking on the lead-plaintiff mantle that Congress intended. At worst, it will be impossible for them to do so. And it is not just institutional investors who face unreasonable burdens from the district court's new disclosure regime: it will also impose substantial discovery burdens and costs on third parties related to the transactions of third-party funds in which a plaintiff invested. *See* Carman, *supra*.

**3.** As Petitioners explain (Pet. 30-31), there is no benefit from requiring disclosure of collateral investments in third-party pooled investment vehicles because they are legally irrelevant. But the downside is substantial. By discouraging or disabling expert institutional investors with a substantial stake in the outcome from serving as lead plaintiffs, the district court's order fundamentally weakens the private enforcement that Congress recognized is essential to protect

the "integrity of American capital markets," "deter wrongdoing," and ensure that "defrauded investors can recover their losses." H.R. Conf. Rep. No. 104-369, at 31. The Court's review is needed now to correct the district court's clear and unmistakable error.

## CONCLUSION

The writ of mandamus should be granted.

June 25, 2021                                    Respectfully submitted,

                                                 s/Hyland Hunt
Christopher A. Seeger                            Hyland Hunt
SEEGER WEISS LLP                                 Ruthanne M. Deutsch
55 Challenger Rd                                 Alexandra Mansbach
Sixth Floor                                      DEUTSCH HUNT PLLC
Ridgefield Park, NJ 07660                        300 New Jersey Ave. NW
Tel.: 973-639-9100                               Suite 900
Fax: 973-679-8656                                Washington, DC 20001
Email: cseeger@seegerweiss.com                   Tel.: 202-868-6915
                                                 Fax: 202-609-8410
                                                 Email: hhunt@deutschhunt.com

*Attorneys for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 3,499 words, and thus complies with the type-volume limitation set forth in Rules 21(d)(1) and 29(a)(5) of the Federal Rules of Appellate Procedure and Local Rule 29.1(c).

s/Hyland Hunt
Hyland Hunt

June 25, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 28, 2021, I served the foregoing corrected brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.


s/Hyland Hunt_____
Hyland Hunt